1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

JOHN LARKIN,

            Plaintiff,

    v.

THE HOME DEPOT, INC.,

            Defendant.

Case No. 13-CV-02868 LB

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT**

[ECF No. 45]

**INTRODUCTION**

Plaintiff John Larkin, who is African American, was a store manager for defendant Home Depot and claims that he was disciplined, denied promotion, and eventually fired because of his race, in violation of California's Fair Employment and Housing Act ("FEHA"). (ECF No. 1 at 16, ¶¶ 26-32.)[1] He also contends that he was disciplined and fired in retaliation for having complained of discrimination. (*Id.* ¶¶ 33-43.) Home Depot has moved for summary judgment on all claims. (ECF No. 45.)

This case is before this court on diversity jurisdiction. *See* 28 U.S.C. § 1332. Larkin filed suit in Alameda County Superior Court; Home Depot then removed the case to this court. (ECF No. 1.) Both parties have consented to the undersigned's jurisdiction. (ECF Nos. 8, 10.) For the

---

[1] Record citations are to documents in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

1    reasons stated below, the court denies Home Depot's motion for summary judgment.

2                                          **STATEMENT**

3         The salient facts of this case are mostly undisputed. The parties instead dispute the inferences

4    that those facts support. The plaintiff tells of a worker who climbed the corporate ladder until

5    hindered and ultimately fired by a new supervisor who discriminated against him based on his

6    race. The defendant tells of a store manager whose performance failed and who in crucial respects

7    was not managing his store.

8    **I.  MR. LARKIN'S JOB UP TO FEBRUARY 2011**

9         The parties' accounts do not differ materially up to and including February 2011, when Gerard

10   Cozy became Mr. Larkin's district manager and direct supervisor. At that time, Mr. Larkin was the

11   manager of the Home Depot store in Pleasanton. (ECF No. 1 at 13, ¶ 9.) He started with Home

12   Depot in 2000 as a part-time associate when he was a student at San Jose State, later became a

13   full-time associate, was promoted to an assistant manager in 2004, and became a store manager in

14   2006, first at the San Leandro store and then, starting in April 2010, at the Pleasanton store.

15   (Larkin Decl., ECF No. 54-5; Vela Decl,. ECF No. 45-5, ¶ 3.)  As a store manager, he reported to

16   the district manager. (Larkin Decl., ECF No. 54-5, ¶ 5.) To the best of Mr. Larkin's recollection,

17   he had five district managers before Cozy. (ECF No. 54-5, ¶ 5.)  Before he worked for Cozy, his

18   regular written performance reviews never included a "below satisfactory" or "needs

19   improvement" rating. (*Id.*, ¶ 6.)  For example, in his February 2010 evaluation for fiscal year

20   2009, his then manager Sumela Vela gave him a performance rating of "O – Top Performer" and a

21   merit-based pay increase of 6.75%. (*Id.* ¶ 7; Vela Decl,. ECF No. 45-5, ¶ 7.)

22        In April 2010, Vela transferred Mr. Larkin from his store in San Leandro to a store in

23   Pleasanton because it was not performing as well as expected, it had many opportunities for

24   improvement, and she sent him to "guide the store in meeting expectations." (Vela Decl., ECF

25   No. 45-5, ¶ 6.)  Mr. Larkin said that when Vela became his manager, she told him she was

26   surprised that he had not yet been promoted to District Manager, sent him to the Pleasanton store

27   to turn it around, and told him that if he were successful there, she would recommend him for a

28   promotion. (Larkin Decl., ECF No. 54-5, ¶ 10.)  Vela explains that she thought his management of

United States District Court
Northern District of California

the business in the San Leandro store was excellent but that he needed additional training, including leadership training, to become promotable. (ECF No. 45-5, ¶ 8.)  She did not think that Mr. Larkin was ready for a promotion to district manager when she promoted him because he had managed only one store; she "thought he needed to be successful managing multiple stores before being ready for a promotion," and she transferred Mr. "Larkin to Pleasanton to give him experience managing another store." (*Id.*, ¶¶ 16-17.)  The Pleasanton store was the closest store to the regional office and "was considered a high-profile store." (*Id.*, ¶ 18.)  When she was the district manager from June 2009 to February 2011, "visiting managers would visit the Pleasanton store if they were in the region on business." (*Id.*)  She thought that transferring Mr. Larkin to the store would be an "opportunity for [him] to prove his merit as a store manager before a potential promotion to district manager, and beginning the training and additional steps to become a district manager." (*Id.*)

Vela says that as Mr. Larkin's district manager, she never recommended him for the Emerging Leaders Program, the Advanced Development Program, or the District Manager Assessment Program (DMAC). (*Id.* ¶ 12; *see* Teruya Dep., ECF No. 45-10 at 35-40 (describing promotion process for a district manager position as requiring completion of these three programs).)  Her understanding and experience is that at minimum, a store manager needs to complete DMAC to be promoted to district manager, and after that, the store manager is considered a potential candidate for an open district-manager position. (Vela Decl., ¶ 13.)  She explains that to be hired as a district manager, the store-manager candidate must interview for an open position and be selected by the Regional Vice President. (*Id.*)

In February 2011, Vela reviewed Mr. Larkin's performance for fiscal year 2010. (Larkin Decl., Ex. B, ECF No. 54-5 at 10.)  She rated him a V2 (down from an O) for "valued associate and well positioned." (Vela Decl., ECF No. 45-5, ¶ 8.) Vela lowered Larkin's rating because she felt that he was not performing as well in Pleasanton as he did in San Leandro, and he did not turn the store around as quickly as she expected. (*Id.*)  Mr. Larkin never complained to her about the review or said that it was unfair. (*Id.*, ¶¶ 10-11.)  In his deposition, Mr. Larkin did not attribute any discriminatory animus to Vela. (Larkin Dep. at 17-18.)

In February 2011, Gerald Cozy became Larkin's new district manager and immediate superior. (ECF No. 1, ¶¶ 15-16; ECF No. 45-9 at 20-21.)  He attended the February 2011 review but had no input into Vela's assessment of Mr. Larkin. (Vela Decl., ECF No. 45-5, ¶ 9.)  But over the next 15 months, Cozy repeatedly disciplined Mr. Larkin. (*See* ECF No. 45-10 at 76-77 (email recounting disciplinary acts); ECF No. 1 at 14-15.)  In May 2012, Cozy sought to fire Larkin on the grounds that he was disengaged from his store's price-reduction practices and was not implementing company policy on inventory loss. (ECF No. 45-10.)  Cozy consulted with the district's human-resources manager, who then sought permission to fire Mr. Larkin from upper (regional) management. (*Id.* at 70-72, 75-79.)  After two regional officers agreed that Mr. Larkin's performance justified ending his employment, Home Depot fired Mr. Larkin. (*Id.* at 75-79; ECF No. 45-11 at 3-5, 8-12.)

The next sections summarize the record about the disciplinary landscape that preceded Home Depot's firing Mr. Larkin.

## II.  THE 2011 DISCIPLINARY ACTIONS

The following are write-ups and reviews in 2011. (Cozy Dep. Exs. 30-32, 34, 36, ECF No. 54-2 at 93-97.)

- 3/3/11:  verbal counseling

- 3/21/11:  verbal counseling regarding controllables (hours and markdowns)

- 5/17/11:  written counseling regarding continued inconsistency with markdowns and weekend staffing (notes improved weekend staffing but still missing the metric)

- 7/1/11:  written counseling regarding lack of pro loader lot associate

- 8/9/11:  written counseling regarding not meeting store controllables (markdowns, staffing, and customer service)

- 9/7/11 midyear review

- 9/29/11: written counseling regarding pack-downs, not setting the cart starter end cap for September, not starting the end fence lines for October, not executing the NLP tri-pod doors, and running over hours and [sales-adjusted hours] for the 2nd half.

Home Depot explains that Cozy was a manager who was focused on meeting metrics for his district that affected a store's operational profit. (Motion, ECF No. 45-1 at 11, summarizing employees' deposition testimony, including Mr. Larkin's.)  Those metrics include sales-adjusted

United States District Court
Northern District of California

United States District Court
Northern District of California

hours, markdowns, and shrink. "Sales Adjusted Hours" have to do with scheduling employee hours based on sales. (Cozy Decl., ECF No. 45-6, ¶ 23.) "Markdowns" are a reduction in price for an item. (ECF No. 45-9 at 7; ECF No. 45-11 at 72-73.) "Shrink" is lost inventory. (ECF No. 45-1 at 11 n.8.) The idea is that all these are "controllable," meaning, a manager can do something about them and thus boost operational profit (as opposed to things that a manager cannot control, such as customer demand).

According to Mr. Larkin, these write-ups were pretextual to create a document trail, and Cozy picked on him in a way that he did not for other managers. (Motion, ECF No. 54 at 9.)  He notes his actual performance in 2011, where he raised his store's sales by $1.7 million and the overall operational profits by more than $700,000 compared to the previous year. (Larkin Decl., ECF No. 54-5, ¶¶ 16-19 & Ex. D.) He points to write-ups of the other store managers in the district to show that no other store manager in the district received as many write-ups. (*Id.*, citing Conger Decl., Ex. O, ECF No. 54-4.) He contrasts the six write-ups Cozy gave him during Cozy's first seven months as district manager in 2011 with the zero write-ups from Vela for the previous 20 months. (Larkin Decl., ECF No. 54-5, ¶ 9.) He cites deposition testimony of other employees and store managers to support his account of being singled out. For example, Oliver Carter says that the Pleasanton store was stocked "the best" and that Cozy visited the store unannounced at least two to three times a week (with the implication that this was excessive). (Carter Dep., ECF No. 54-2 at 79.)  By contrast, Christopher Nunez says that Cozy visited his store unannounced in San Jose every other week. (Nunez Dep., ECF No. 54-3 at 37-38.)  Tyler Schaffer said the following:

> We had walked John's store once; it was for a district walk. It was a garden walk. And the store looked absolutely phenomenal. Like you'd see in a Home Depot commercial. They had spent so much work. And his store looked like that every day. And we were close to the end of the walk and Jerry [Cozy] said, "What's this sign doing out of place?" And it was a very minute thing, like a customer wouldn't even know. And it was very stern, the way he said it. And he looked right at John and basically pointed him out to the rest of the team. . . .

(Schaffer Dep., ECF No. 54-2 at 55.)  He acknowledged that Cozy was "nitpicky at other stores as well  . . . but definitely not the same intensity that I had experienced when he was at John's store. It seemed like there was something between them that I didn't know about." (*Id.* at 56.)

Schaffer said that Cozy never wrote him up for anything (although they got into arguments)

despite the fact that his store had plenty of "opportunities" (Home Depot's term for "problems") for write-ups. (*Id.* at 57.)  For example, Cozy gave a written discipline to Mr. Larkin for not having a "pro-loader" (*see* bullet point four, above) but for a similar problem he merely talked to Mr. Schaffer, who is white. (Schaffer Decl., ECF No. 54-2 at 75, ¶ 15.)  (A pro-loader is an employee who staffs the dedicated area where contractors pick up materials and helps load them. (ECF No. 56 at 10.)) Similarly, Cozy gave a written discipline to Mr. Larkin in May 2011 for missing markdown goals three of six weeks and staffing two of six weeks (*see* bullet point three, above) but (according to Mr. Larkin) Cozy did not discipline Mr. Echevarria (blond hair, blue eyes, and a Basque), who was promoted (after completing DMAC). (ECF No. 54-5, ¶ 26; Opposition, ECF No. 54 at 10.)

Cozy's explanation for why he treated managers differently is that Shaffer and Nunez were newer managers and thus he gave them leeway, while Mr. Larkin was an experienced hand who should have performed better. (ECF No. 56-2 at 3-4, 6, ¶¶ 11, 13-14, 26.)

> Since Schaffer was new to the East San Jose store, I wanted to give him a reasonable amount of time to get to know his team . . . [and] ensure his ASMs knew his expectations. Ordinarily, my practice would not be to issue written disciplinary notice to a new store manager or a store manager new to a store in the district in the first 90 days of their arrival. In my view, issuing discipline to Schaffer would have been premature because he was brand new to his store and the district. However, I did manage him and verbally counsel Schaffer on performance deficiencies . . . at this store . . . .
>
> . . . .
>
> Nuñez was promoted to a store manager position in March 2011 . . . . I usually do not issue written discipline to brand new store managers . . . . I wanted to give Nuñez time to adjust to his new position, learn the business records in his store, and ensure his ASMs knew his expectations.

(*Id.* at 3-4, ¶¶ 11, 13.) By contrast, "Larkin had already been a store manager for five years in [this] District . . . and had been the Pleasanton Store Manager for approximately a year." (*Id.* at 4, ¶ 14.) Cozy "thought this was sufficient time for [Larkin] to have established processes and have his team trained to address deficiencies in [performance] metrics." (*Id.*) "The difference in time [that] Larkin had been the Store Manager in Pleasanton compared to" Schaffer and Nuñez in their stores "factored into my evaluation of their performance." (*Id.*)

///

### III.  MR. LARKIN COMPLAINS OF RACE DISCRIMINATION IN SEPTEMBER 2011

    After his mid-year performance review in September 2011, which talked about markdowns, Mr. Larkin complained to Elena Matos, the district human-resources manager, that there were no African-American managers above the level of store manager in the entire region, that he felt he was not being promoted because of his race, and that there was no other reason because his numbers were good, the store was fantastic, he was training all the new store managers when they came in, and he had "done it all . . . was doing it all."  (Larkin Dep., ECF No. 54-2 at 22-23; Larkin Decl., ECF No. 54-5, ¶ 12.)  Matos said that she did not think that was the case. (Larkin Dep., ECF No. 54-2 at 22-23.)  Mr. Larkin then told Cozy directly that he felt Cozy was discriminating against him based on his race. (Larkin Decl., ECF No. 54-5, ¶ 12.)  Right after that, Cozy disciplined him for his pack-down reports. (*See* bullet point seven, above.)  Mr. Larkin says that this was discriminatory, retaliatory, and wrong because Mr. Larkin discovered (and brought to Cozy's attention) that a lower-level associate was manipulating the pack-down reports to make it look like she was bringing items down from the top shelves to the bottom when she was not. (Larkin Dep., ECF No. 54-2, at 30-31.)  Mr. Larkin said that he uncovered and corrected the reports and told Cozy because it was an integrity issue. (*Id.*) Cozy got angry that he fixed it all at once (as opposed to "slowly" fixing the issue) because it made Cozy look bad, and he wrote him up (wrongfully, according to Mr. Larkin).

### IV.  EVENTS IN 2012 BEFORE MR. LARKIN'S TERMINATION

    In the first few months of 2012, Mr. Larkin's store brought in net sales of $13 million, an increase of more than $420,000 over the previous year. (Larkin Decl., ECF No. 54-5, ¶ 20 & Ex. F.)   He continued to experience discipline actions: (A) in February for events surrounding his firing an employee; (B) in February for issues regarding shrink (or theft); and (C) in April for going markdown issues and going over hours on staffing.

#### A.  Written Discipline in February 2012

    In February 2012, Matos disciplined Mr. Larkin for allegedly terminating an employee without consulting her. Mr. Larkin says that it shows her racial animus because she initiated the

United States District Court
Northern District of California

termination decision and then lied about it to justify her disciplining him. (Opposition, ECF No.

54 at 12, 25.) Specifically,

> At her deposition, [Matos] again swore that Larkin terminated the employee without
> consulting her. Yet, three separate emails between Matos and Larkin show that not only
> was Matos informed of the termination, she actually *initiated* the termination decision,
> telling Larkin that he either needed to remove the employee from [probation] or terminate
> him "ASAP" and urging him to "make a decision this week."
>
> . . . .
>
> Matos refused to investigate Larkin's discrimination claim and, instead, encouraged
> Larkin to terminate an associate "ASAP" and then *lied* about it to justify disciplining
> Larkin.

(*Id.* at 12, 25 (emphases in original).) In February 2012, Matos emailed Mr. Larkin and other

managers that certain employees were reaching the end of their 120-day probationary period and

> need to be removed from a PIP [performance improvement plan] or terminated ASAP.
> I've sent several communications regarding the follow-up to these PIP's, so we should
> not have any associates go late at this point. Lionel, you should make a decision this
> week regarding [name omitted], and the same things for John Larkin regarding [name
> omitted] at 629. Please let me know if you have any questions or concerns. Thanks.

(ECF No. 54-5, Ex. M.)  On March 1, 2012, Mr. Larkin responded, saying that if the employees

were both working that day, "it will happen today." (*Id.*)  Matos responded, "The terms

[terminations] are occurring today?" (*Id.*) Mr. Larkin responded, "We will be terming [names

omitted]." (*Id.*)

On March 27, 2012, Matos issued a "Progressive Disciplinary Notice":

> John Larkin terminated an associate, and after further investigation, it was determined
> that there were several concerns regarding the termination and the lack of consistent
> processes during the associate's tenure that ultimately led to the reinstatement of this
> associate. John needs to ensure that he takes a partner when he's handling associate
> concerns that may involve associates that have filed a formal internal complaint and that
> may be covered under FMLA and ADA so that we can ensure that we're making the
> correct employment decisions. In this specific situation the store did not properly follow
> [Home Depot]'s performance improvement process and they did not engage in the
> interactive process with this associate when they should have. Based on the Company's
> investigation, it has been determined that this performance fell below the standards
> expected for job performance.

(ECF No. 53-3 at 51.) In her deposition, counsel asked Matos questions about the employee. First,

counsel asked if Matos was involved in any conversations about the terminated employee (his

performance, his health, or his performance-improvement plan) from the date he returned from his

leave of absence to the date he was terminated, and she answered, "not that I can remember." (ECF No. 54-3 at 46.) She said that she did not remember talking to Mr. Larkin or Vinay Singh (one of Mr. Larkin's assistant managers) about the terminated employee during this period. (*Id.*) The following interchange took place:

Q:  Did anyone tell you he was going to be terminated before he was terminated?

A:  No.

(*Id.* at 46-47.)

**B. Annual Inventory Reveals High Shrink At Pleasanton Store**

At the end of February 2012, an annual inventory revealed that the Pleasanton store had lost too much product. Cozy says that the store was 62 basis points off its target number, and he thought that was too high. (Cozy Decl., ECF No. 45-6, ¶ 34.) Cozy sent a district investigator, Josh Beckler, to conduct a "deep" training with the Pleasanton managers on the issue of inventory loss. (*Id.*, ¶ 36; ECF No. 45-7 at 34; ECF No. 45-10 at 62.) The training concluded with Beckler and the Pleasanton staff developing a "game plan" to turn around the store's shrink numbers. (ECF No. 45-10 at 62.) When Beckler returned to Pleasanton a month later to evaluate the store's progress, he found that Mr. Larkin and his managers had not implemented the plan. (ECF No. 45-6 at 7 (¶¶ 44-47; ECF No. 45-7 at 34.) This was on May 5, 2012, a little more than two weeks before Mr. Larkin was fired. (ECF No. 45-6 at 6 (¶ 36); ECF No. 45-7 at 34.)

Mr. Larkin asserts that this is another example of Cozy setting him up to fail and reflects Cozy's racial animus. Mr. Larkin asked that a "loss-prevention associate" — what Home Depot calls an "asset-protection manager" — be assigned to his store. (*See* ECF No. 54 at 7; ECF No. 56-1 at 20-21.) He was not assigned one. (ECF No. 56-1 at 20-21.) Larkin calls this especially significant because asset-protection managers guard against theft, so that this decision affected his store's inventory "shrink" — a subject for which he was disciplined and ultimately fired. (*Id.*)

Cozy said that he did not make the decision about whether to assign any store an asset-protection manager; regional management makes that decision. (ECF No. 56-2 at 4, ¶ 18.) Beckler said that under the criteria that Home Depot used to assign such personnel, the Pleasanton store did not warrant one because the Pleasanton store is not in a high-crime area. (ECF No. 56-1 at 20-

1   21.) Most stores in Cozy's district did not have asset-protection managers; "[t]his included stores

2   with non-African American store managers." (ECF No. 56-2 at 4 (¶ 19).) Of the 118 stores in the

3   region, only 11 had asset-protection managers. (ECF No. 56-1 at 20-21.)

4   **C.  Markdown Issues**

5   Starting around the end of February or early March 2012, Cozy began pushing store managers

6   to control markdowns and meet each store's markdown budget. (*See* Cozy Decl., ECF No. 45-6 at

7   4-5, ¶¶ 14-16, 24, 26-28.) He said that he emphasized the importance of each store "controlling"

8   its markdowns and meeting its markdown budget. (*Id.*) One store manager in Cozy's district

9   testified that the pressure over markdowns was intense and that the managers expected some

10   people to get fired over markdowns. (ECF No. 45-11 at 70-72.) During this period, Cozy

11   disciplined six of his nine store managers over markdowns, including Larkin. (ECF No. 45-7 at

12   23-28 (sealed); *see* ECF No. 45-1 at 12.)

13   The record reflects that the district's human-resources manager, Matos, "coached" and

14   "counseled" on March 27, 2012 (coaching) and April 5, 2012 (written notice of counseling) for

15   not meeting goals regarding markdowns and not scheduling too many hours on the weekends.

16   (ECF No. 54-2 at 98; ECF No. 45-9 at 47.)  These are reflected on a single written "Progressive

17   Disciplinary Notice" that includes the following:

18   John continues to not meet expectations regarding store controllables, including
     markdown and staffing results at his store. Despite numerous conversations with John
19   regarding the need for better markdown control, John's store has exceeded its store
     markdown plan 5 out of 9 weeks and is currently in the bottom 25 of the region with
20   markdowns at 28bpts over the first quarter. In regard to staffing, John has consistently ran
     over hours and is currently 2.5% over SAH QTD and has been over hours the past 8 out
21   of 9 weeks. Based on the Company's investigation, it has been determined that this
     performance fell below the standards expected for job performance.
22

23   (ECF No. 54-2 at 98.)

24   In April 2012, one month before Larkin was fired, store-performance data suggested that the

25   Pleasanton store might be "holding markdowns," and Cary Teruya, the district operations

26   manager, saw carts in the back of the store that said "not marked down."  (Teruya Dep., ECF No.

27   45-10 at 32-33.) Home Depot policy requires stores to account for their markdowns daily. (ECF

28   45-1 at 14 n. 12.) In order to meet a given day's markdown budget, however, a store may "hold" a

1    markdown to be entered on another day when it will not threaten to break the daily budget. The

2    practice of "holding markdowns," in other words, spreads the effect of the held markdown over a

3    number of days so that markdowns do not exceed any one day's budget. In her email seeking

4    permission to fire Mr. Larson, Matos called this practice a "serious" infraction for which

5    employees can be and have been fired. (*E.g.*, ECF No. 45-7 at 42-44.)

6        Because the data suggested that the Pleasanton store might be holding markdowns, district-

7    level personnel investigated. They determined that Larkin's assistant store managers (ASMs) had

8    formed a plan to hold markdowns and were doing just that. (ECF No. 45-10 at 25-31.) The parties

9    agree that Larkin was unaware of this. He played no role in forming the plan and did not know that

10   his ASMs were holding markdowns. (*See* ECF No. 45-6 at 6-7 (¶¶ 40-42); ECF No. 45-1 at 15;

11   ECF No. 54 at 14, 21; *see* ECF No. 45-11 at 34.)

12       Mr. Larkin explains that markdowns were ultimately the ASMs' responsibility, and a store

13   manager "cannot micro-manage every task" that his ASMs perform. (Opposition, ECF No. 54 at

14   14, 21-22.) As evidence of Cozy's bad motives, Mr. Larkin points out that Cozy sent investigators

15   in when Mr. Larkin was on vacation with his family in Southern California. (Larkin Decl., ECF

16   No. 54-5, ¶ 32.)  The carts that gave rise to Teruya's suspicion were not there when Mr. Larkin left

17   for his vacation, and thus Mr. Larkin did not see them. (Singh Dep., No. 54-3, at 83-85; Larkin

18   Decl., ECF No. 54-5, ¶ 32.) Mr. Larkin also notes that he reviewed markdown reports with his

19   ASMs every week. (Levya Dep., ECF No. 54-2 at 44.) He notes that when he was on vacation, he

20   reviewed his store's Scorecard, which captures the store's metrics, saw that his markdowns

21   appeared unusually low, and called into the store to ask someone to look into the issue. (Larkin

22   Decl., ECF No. 54-5 at 8, ¶ 33.) It was then he learned that Beckler and Tenuya had been into the

23   store already to investigate the markdowns. (*Id.*) He never knew before the investigation that his

24   store processed markdowns any differently than any other store in the district. (*Id.*)

25       Mr. Larkin also asserts that Cozy encouraged and condoned the delay of markdowns, the "very

26   thing that he terminated [Mr.] Larkin for!" (Opposition, ECF No. 54 at 13.) Mr. Larkin says that

27   Cozy instructed one of Mr. Larkin's ASMs, Vinay Singh, to hold markdowns. (*See* ECF 54 at 13.)

28   Larkin writes:

United States District Court
Northern District of California

> Cozy specifically instructed . . . Singh, to delay processing high[-]value mark-downs in order to make it appear as if the store was coming in under budget. (Singh Dep. 22:19-42:2, Ex. 60.) Therefore, a jury could disbelieve the claim that Cozy recommended Larkin's termination because his store was doing *the very thing he* [Cozy] *instructed them to do*.

(Opposition, ECF No. 54 at 21 (emphasis in original, citing Singh deposition.) This reading of the record is not accurate. Looking at Singh's testimony and statement, Singh explains that Cozy wanted a warning and explanation if markdowns were going to exceed the daily budget. (*See* ECF No. 54-3 at 3-9.) In a subsequent declaration, Singh explains that this is what he meant and denies that Cozy told him to hold markdowns:

> I am informed that Larkin's attorneys have argued that Cozy specifically instructed me to delay the processing of mark-downs to avoid going over budget. That is not true.
> . . . .
>
> I write this to remove any lingering ambiguity as to whether or not Mr. Cozy ever told me to delay or hold markdowns. He did not. He simply asked to be notified if the store was going to miss its markdown numbers so that he was not surprised. He simply wanted an explanation.

(ECF No. 56-4 at 2-3, ¶¶ 3-7.)

Mr. Larkin also says that Cozy allowed Schaffer to manipulate its markdown and inventory reports by hiding missing inventory: Schaffer's store kept a list of missing items, and on days when they had extra markdown items, they would process missing items as markdowns (making it look like they'd been returned or damaged instead of stolen). (Schaffer Dep., ECF No. 54-2 at 61-62.) As to the "going over hours" issues in Matos's progressive disciplinary notice to him, Mr. Larkin notes that Schaffer, Echeverria, and Nunez exceeded staffing goals for ten out of eleven weeks in a row, five out of nine weeks, and six out of seven weeks in a row, respectively, and were not disciplined. (Opposition, ECF No. 5 at 11 (citing Larkin Decl. and disciplinary records). Cozy responded that he had concerns about Schaffer, thought it more appropriate to counsel new managers such as Schaffer and Nunez, and in any event, Schaffer resigned within five months in May 2012. (Cozy Decl., ECF No. 56-2, ¶¶ 10-11.) As to Echeverria, Cozy says that Mr. Larkin is using "incomplete" data to judge managers' performances. (*Id.* at 3, 5, ¶¶ 9, 12, 24.)

Mr. Larkin also points out that Cozy allowed slow processing of high-dollar returns over time

so that stores could avoid going over their markdown budgets on a given day, which he says casts doubt on their assertion that markdowns needed to be processed and be at zero at the end of every day. (Opposition, ECF No. 54 at 13; Beckler Dep., ECF No. 54-3 at 59, 65-66.)  Other stores were experiencing delays in processing their markdowns, and there was confusion over the implementation of a new markdown process. (Beckler Dep., ECF No. 54-3 at 57-63.) Nunez knew that his employees were staging markdowns in receiving because they did not have the dollars to process, yet he did not get fired. (*See* Ex. 64 to Nunez Dep., ECF No. 54-3 at 41.) The other stores were given a pass, and Mr. Larkin was fired for something he knew nothing about. Cozy never gave him a performance-improvement plan or a final written warning, unlike a white store manager who was struggling, received both, and was not fired. (Conger Decl., ECF No. 54-1, ¶ 17 & Ex. O.)

Home Depot characterizes Mr. Larkin's lack of knowledge as a management failure: Larkin was unaware that his assistants were violating a key company policy, at a time when the district's emphasis on markdowns should have found him managing the issue closely. (Motion, ECF No. 45-1 at 8, 15.) Cozy said that the markdown issues and the failure to implement district policy on inventory loss (*see* last section) were "egregious breaches of [Larkin's] responsibility as a Store Manager." (Cozy Decl., ECF No. 45-6 at 7, ¶¶ 44-47.)  Cozy also said:

> When I evaluated my Store Managers' work performance, missing a . . . metric was important, but I also looked to see if the Store Manager had a game plan, recognized the deficiency, was proactively taking steps to address the deficiency, and that the Store Manager was doing everything he or she could to address the deficiency.

(*Id.,* ¶ 17.)  He was "stunned" by Mr. Larkin's lack of engagement in his store's markdown process, "particularly given the emphasis" that the district placed on the issue."  (*Id.* ¶¶ 41-42.) He also said that Mr. Larkin was using "incomplete" data to judge managers' performances, and that when one looked at complete data, for example, Mr. Larkin's markdown numbers in Pleasanton were more than twice as bad as Echevarria's. (*Id.*, ¶ 24.)

District operations manager Cary Teruya testified that follow-through on identified issues was a "problem" area for Larkin:

Q:   What kind of complaints did you make to Jerry Cozy about [Mr. Larkin]?

United States District Court
Northern District of California

A: John would always say he got it and —

Q: He'd say like, "I got it. I got it."?

A: "You have the issue." "I got it." "You got this issue." "I got it." *And the problem is nothing ever happened from — from that.*

(ECF No. 56-1 at 15-16.) Teruya said that he complained to Cozy about this issue with Larkin on multiple occasions. (*Id.* at 16.)

## V. HOME DEPOT FIRES MR. LARKIN

Cozy recommended to Matos that Home Depot fire Mr. Larkin. (Willette Dep., ECF No. 54-5 at 8.) Matos then sent an email to Regional Human Resources Director Eric Willette referencing Mr. Larkin's "inconsistent performance concerns and leadership issues" and "outlin[ing] . . . the past and present performance/discipline concerns regarding John." (ECF No. 45-10 at 3.) She lists the disciplinary actions summarized in this order and asks for "termination with severance approval." (*Id.* at 3-4.) Willette forwarded the email to Dana Woodard, the regional manager for associate relations, and Anthony Hurst, the Pacific North Regional Vice President. (*Id.;* Willette Decl., ECF No. 45-4, ¶ 3.) Woodard forwarded it to Sheila Douglas. (ECF No. 45-10 at 3.) Hurst and Willette approved Mr. Larkin's termination. ((Willet Dep., ECF No. 54-5 at 8-9.) He was later fired.

One day before Home Depot fired Mr. Larkin, they promoted a white man to District Manager. (Conger Decl., Ex. Q, ECF No. 54-4.)  Employees are not made aware of District Manager openings or allowed to submit applications for them. Instead, they must be recommended by their District Managers, and regional  leadership makes the decision about who to promote. (Willette Decl., ECF No. 45-4, ¶ 7.) The only store manager who moved up under Cozy was Echeverria (although Home Depot says someone else recommended him). The only other store manager ranked "promotable" by Cozy was Schaffer. (Conger Decl., Ex. P, ECF No. 54-5 at 31-36.)

## VI. TREATMENT OF OTHER AFRICAN-AMERICAN MANAGERS

Mr. Larkin also points to Cozy's treatment of other African-American store managers. According to Mr. Larkin, Cozy tried to move him and another African-American store manager out of his district, suggesting that they take new positions as "District Speciality Managers,"

which was a step down. (Opposition, ECF No. 54 at 7, citing Larkin Dep.). He says that the other African-American caved to the pressure and was replaced by a white male. (*Id.*)  When Cozy became district manager, Larkin writes, the district had five African-American store managers; by the time Larkin was fired, Cozy had "push[ed] . . . out" all but one and replaced them with Caucasians. (*Id.* at 5, 7, 22.)

One manager is Alicia Lacour, who became a District Services Manager ("DSM") for Home Depot in 2011 and previously was the store manager at the Union City store. (ECF No. 56-3 at 2, ¶ 2.)  She says that Cozy was "somewhat of a mentor" to her when previously they both worked in another district (she was an ASM at one store, and he was the store manager at a different store). (*Id.* ¶¶ 3-4.) She says he was instrumental in her growth as an ASM and developing her to become a store manager. (*Id.*) When she was store manager in Union City, Cozy was the district manager, did not give her special treatment (despite his being her mentor), treated her equally to her fellow store managers, was focused on metrics, disciplined her for missing weekend staff goals, and disciplined others regarding weekend staffing. (*Id.* ¶¶ 4-5).) Lacour heard about the DSM position from another DSM and sought Cozy's advice. He told her that it would be a challenge and would offer her "greater visibility and exposure at a district level." (*Id.* ¶¶ 7-8.) Lacour continues:

> The decision to take the District[-]level position was entirely mine. I was not forced out . . . by Cozy and my experiences with Cozy have been very positive. I have not seen or heard of any behavior from Cozy that would lead me to believe that he acts with any racial animus towards African American[s]. Certainly I have not personally endured any such treatment from Cozy and have never perceived him treating African American store managers differently than Caucasian store managers.

(*Id.*, ¶ 8.)

Another African-American store manager who left Cozy's district is Akhenaton Smith, who left Cozy's district to become manager of the Home Depot store in Oakland. (ECF No. 56-5 at 2, ¶¶ 2-6.) He says that "[w]hile the position was a lateral move, it did come with a significant increase in pay and responsibility. The Oakland store was larger and more challenging . . . . I was pleased to accept the position." (*Id.* ¶ 6.) His decision to accept the Oakland position had nothing to do with Cozy, and his interaction with Cozy was limited because he left a few weeks after Cozy

1   arrived in the district. (*Id.* ¶ 8.) He did not witness any behavior by Cozy that led him to believe

2   that Cozy harbored any racial animus, and "any contention that I was forced out of District 295 by

3   Mr. Cozy because of my race is patently false." (*Id.* ¶ 13.)

4       Lionel Stevens also was and still is an African-American store manager. (ECF No. 45-6 at 9,

5   ¶ 62.) Cozy calls Stevens his "best manager." (*Id.* at 9, ¶ 65; ECF No. 45-9 at 113.) Stevens was

6   the only store manager, African American or other, that Cozy recommended for the Home Depot

7   "Emerging Leaders" program that served as the first step toward further promotion. (ECF No. 45-

8   9 at 114-15; *see* Teruya Dep., ECF No. 45-10 at 35-40 (describing promotion process for a district

9   manager position). Cozy says that he recommended Stevens for Emerging Leaders because he

10  "did a fantastic job." (ECF No. 45-9 at 115.)

11      Mr. Larkin disputes this picture of how Cozy viewed and treated Stevens. According to Mr.

12  Larkin, "the evidence does not indicate" that Cozy acted to "help Stevens move up." (ECF No. 54

13  at 14 n. 14.) "Instead," Mr. Larkin says, Cozy "criticized Stevens for his 'comfort around higher

14  management' as well as his 'patience,' his 'decision-making,' and his 'strategic agility.'" (*Id.*) Mr.

15  Larkin here cites a "Performance and Development Summary" from March 2012 in which Cozy

16  reviewed Stevens's work. (ECF No. 52-16 (sealed).)  That review also says among many other

17  positive things that Stevens "has done an exceptional job as the Hayward store manager," that his

18  "passion for the business is infectious and has created strong morale in the store," and that he "has

19  done a fantastic job with store standards and has good attention to detail." (*Id.*) The criticism about

20  "patience" is that Stevens wants everything "done faster" and is "intolerant to a slower pace than

21  his. (*Id.*) The remark about "comfort around higher management" is that Stevens should be more

22  comfortable because he tends to "appear nervous [and] tense [and] not at his best around upper

23  mgmt." (*Id.*)

24      Mr. Larkin also points out that only the San Leandro (Mr. Stevens's) store and his Pleasanton

25  store were investigated for markdowns. Home Depot points out that Mr. Stevens was not

26  disciplined and that "San Leandro's issues turned out to be related to a few tough days rather than

27  a policy violation." (Beckler Dep., ECF No. 56-1 at 22-23.)

28  ///

United States District Court
Northern District of California

# VII. RULINGS ON EVIDENTIARY OBJECTIONS

The court overrules the parties' respective objections.

As to Mr. Larkin's objections, generally the evidence is relevant (e.g., the disciplinary records) or the documents are business records (although not all emails necessarily are business records, just the relied-upon portions here). Moreover, some of the emails are advanced to show that certain statements were made, not to establish the truth of the matters asserted. The foundation objections are overruled.

As to Home Depot's objections, the objections as to the foundation for or speculative nature of witnesses' declarations are overruled (to the extent that they are recounted in this order). The relevance objections are overruled. The alleged inconsistencies do not render Mr. Larkin's declaration a sham affidavit.

The court otherwise relied only on the evidence summarized in this order, and thus the objections to evidence not summarized are moot.

## ANALYSIS

California's FEHA makes it unlawful for an "employer, because of the race . . . of any person . . . to discriminate against the person in compensation or in terms, conditions, or privileges of employment." Cal. Gov't Code §12940(a). Larkin's first claim is that Home Depot disciplined, failed to promote, and then fired him because of his race. (ECF No. 1 ¶¶ 26-32.) His second claim is that Home Depot retaliated against him (by disciplining, not promoting, and then firing him) after he "complain[ed] of race discrimination" to his district manager (Cozy) and the district human-resources manager (Matos). (*Id.* ¶¶ 33-43.)

# I. GOVERNING LAW

## A. Summary Judgment — Rule 56

A principal purpose of summary judgment is to isolate and dispose of factually unsupported claims. *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment is proper if "the materials in the record" such as "depositions, documents, electronically stored information, affidavits," and "discovery responses show that there "no genuine issue as to any material fact" and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P.

United States District Court
Northern District of California

1   56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those

2   that may affect the outcome of the case. *See id.* at 248. A dispute about a material fact is genuine if

3   there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *See*

4   *id.* at 248-49.

5       A party moving for summary judgment bears the initial burden of identifying the evidence that

6   demonstrates the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323.

7   A party moving for summary judgment who does not have the burden of persuasion at trial has the

8   initial burden of either producing evidence negating an essential element of the non-moving

9   party's claim or showing that the non-moving party does not have evidence of an essential element

10  to carry its ultimate burden of persuasion at trial. *Nissan Marine Fire Ins. Co. v. Fritz Co.*, 210

11  F.3d 1099, 1102 (9th Cir. 2003). Where a party moving for summary judgment bears the burden

12  of proof at trial, it has the initial burden of producing evidence that entitles it to a directed verdict

13  if the evidence went uncontroverted at trial. *C.A.R. Transp. Brokerage, Inc. v. Darden*, 213 F.3d

14  474, 480 (9th Cir. 2000).

15      If the moving party does not satisfy its initial burden, the non-moving party has no obligation

16  to produce anything, and the court must deny summary judgment. If the moving party does satisfy

17  its initial burden of production, then the non-moving party may not rest upon mere allegations or

18  denials of the adverse party's evidence but instead must produce admissible evidence that shows

19  that there is a genuine issue of material fact for trial. *Nissan Marine*, 210 F.3d at 1102.

20      "In considering a motion for summary judgment, the court may not weigh the evidence or

21  make credibility determinations, and is required to draw all inferences in a light most favorable to

22  the nonmoving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 19977); *accord Volterra*

23  *Semiconductor Corp. v. Primarion, Inc.*, 796 F. Supp. 2d 1025, 1037 (N.D. Cal. May 4, 2011).

24      **B.  California Fair Employment & Housing Act**

25      All of Mr. Larkin's FEHA claims advance "disparate treatment" theories of discrimination.

26  "Because of the similarity between state and federal employment discrimination laws, California

27  courts look to pertinent federal precedent when applying [California] statutes." *Guz v. Bechtel*

28  *Nat. Inc.*, 24 Cal.4th 317, 354 (2000); *accord, e.g., Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217,

United States District Court
Northern District of California

1219 (9th Cir. 1998).

The Supreme Court has described disparate treatment as follows:

"Disparate treatment" . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion [or other protected characteristics]. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment . . . .

*Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609 (1993).

In disparate-treatment cases, "liability depends on whether the protected trait" — in this case, race — "actually motivated the employer's decision. . . ." *Id.* at 610 (citing cases). A "disparate[-]treatment claim cannot succeed unless the employee's protected trait actually played a role" and was a "substantial motivating factor" in the challenged decision. *Id.* ("cannot succeed"); *Harris v. City of Santa Monica*, 56 Cal.4th 203, 232 (2013) ("factor"). Discriminatory intent can be shown through direct or circumstantial evidence. *Desert Palace v. Costa*, 539 U.S. 90, 91 (2003). "The ultimate question in every [disparate-treatment] case is whether the plaintiff was a victim of intentional discrimination." *Reeves v. Sanderson Plumbing, Inc.*, 530 U.S. 133, 153 (2000).

"California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination . . . based on a theory of disparate treatment." *Guz*, 24 Cal.4th at 354 (citing, *inter alia*, *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)). "This so-called *McDonnell Douglas* test reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially. Thus, . . . the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained." *Guz*, 24 Cal. 4th at 354.

"The specific elements of a prima facie case [of discrimination] may vary depending on the particular facts. Generally, the plaintiff must provide evidence that (1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive" (such as similarly situated individuals outside the protected class who were treated differently.) *See id.* at 355 (citations omitted). If the plaintiff shows this prima facie case, then "a presumption

United States District Court
Northern District of California

1    of discrimination arises." *Id.* "[T]he burden [then] shifts to the employer to rebut the presumption

2    by producing admissible evidence, sufficient to 'raise[] a genuine issue of fact' and to 'justify a

3    judgment for the [employer],' that its action was taken for a legitimate, nondiscriminatory reason."

4    *Id.* at 355-56 (citing cases).

5        "If the employer sustains this burden, the presumption of discrimination disappears." *Id.* at 356

6    (citing cases). "The plaintiff must then have the opportunity to attack the employer's proffered

7    reasons as pretexts for discrimination . . . ." *Id.* (citing cases). The plaintiff can show that an

8    employer's stated reasons are merely pretexts  "either directly by persuading the court that a

9    discriminatory reason more likely motivated the employer or indirectly by showing that the

10   employer's proffered explanation is unworthy of credence." *Texas Dep't of Cmty. Affairs v.*

11   *Burdine*, 450 U.S. 248, 256 (1981). "The ultimate burden of persuasion on the issue of actual

12   discrimination remains with the plaintiff." *Guz*, 24 Cal.4th at 356 (citing cases).

## II. DISCRIMINATION CLAIM

### A.  Prima Facie Case and Home Depot's Proffered Legitimate Reason

15       Mr. Larkin has shown that he is a member of a protected class, that he was performing his job

16   satisfactorily, that he suffered an adverse employment action, and that others outside the protected

17   class had issues with markdowns and staffing and were not fired (while he was).

18       Home Depot nonetheless argues that Mr. Larkin cannot meet even his *prima facie* burden of

19   showing that he was performing his job competently. (ECF No. 56 at 7.)  Some courts conclude

20   that a plaintiff can establish his *prima facie* case by showing that he was hired into the position in

21   the first place (as Mr. Larkin was) and thus presumably is minimally qualified, and that the court

22   should defer a more thorough inquiry until the pretext stage. *See Riley v. Lance, Inc.*, 518 F.3d

23   996, 1000 (8th Cir. 2008). In a similar vein, the Ninth Circuit has held that an employer cannot

24   rely on subjective factors such as "attitude, manner, tone, and other similar traits" to dispute that

25   an employee was "otherwise qualified" in the first stage of the *McDonnell Douglas* test. *See*

26   *Nicolson v. Hyannis Air Serv.*, 580 F.3d 116, 1123-24 (9th Cir. 2009). Given that Mr. Larkin had

27   good to great reviews up to February 2011 and zero disciplinary actions in the entire 20 months he

28   was supervised by Vela, his supervisor immediately before Cozy, Mr. Larkin has established a

1    *prima facie* case. It is a minimal burden to establish a *prima facie* case. *See St. Mary's Honor*

2    *Center v. Hicks*, 509 U.S. 502, 506 (1993).

3        Mr. Larkin concedes that Home Depot met its "burden of proffering . . . a legitimate reason for

4    [his] termination." (ECF No. 5 at 20.) The court agrees that it has.

5    **B. Pretext**

6        Both parties deal with this case almost exclusively under the "pretext" stage of the *McDonnell*

7    *Douglas* analysis. That approach makes sense: whether similarly situated employees were treated

8    more favorably than the protected group generally is analyzed at the pretext stage, not the prima

9    facie stage. *See Hawn v. Executive Jet Mgmt., Inc.*, 615 F.3d 1151, 1157-58 (9th Cir. 2010).

10   Moreover, the *McDonnell Douglas* factors are flexible and must be tailored, on a case-by-case

11   basis, to different factual circumstances. *See McDonnell Douglas*, 411 U.S. at 802.  The

12   *McDonnell Douglas* framework was "never intended to be rigid, mechanized, or ritualistic. Rather,

13   it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it

14   bears on the critical question of discrimination." *United States Postal Serv. Bd. of Governors v.*

15   *Aikens*, 460 U.S. 711, 715 (1983). After all, the plaintiff's burden of showing pretext "merges with

16   the [plaintiff's] ultimate burden of persuading the court that [the plaintiff] has been the victim of

17   intentional discrimination." *Burdine*, 450 U.S. at 256.

18       A plaintiff can show pretext "directly by persuading the court that a discriminatory reason

19   more likely motivated the employer." *Id.*; *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1127

20   (9th Cir. 2000). Direct evidence "is evidence which, if believed, proves the fact of discriminatory

21   animus without inference or presumption," and it "typically consists of clearly sexist, racist, or

22   similarly discriminatory statements or actions by the employer." *Coghlan v. Am. Seafoods Co.*,

23   413 F.3d 1090, 1094-95 (9th Cir. 2005). Very little direct evidence is required to raise a genuine

24   issue of material fact. *Id.* at 1095. There is no direct evidence of racial animus here.

25       A plaintiff can also show pretext "indirectly by showing that the employer's proffered

26   explanation is unworthy of credence.'" *Burdine*, 450 U.S. at 256; *see Chuang,* 225 F.3d at 1127.

27   "In appropriate circumstances, the trier of fact can infer from the falsity of the explanation that the

28   employer is dissembling to cover up a discriminatory purpose." *Reeves*, 530 U.S. at 147.  Indirect,

United States District Court
Northern District of California

1   circumstantial evidence must be "specific and substantial." *Vasquez v. County of Los Angeles*, 349

2   F.3d 634, 642 (9th Cir. 2004); *Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061, 1066-67 (9th

3   Cir. 2003); *see Njenga v. San Mateo Cnty. Superintendent of Sch.*, No. C-08-04019 EDL, 2010

4   WL 1261493, at *20 (N.D. Cal. Mar. 30, 2010) ("When direct evidence is unavailable, however,

5   and the plaintiff proffers only circumstantial evidence that the employer's motives were different

6   from its stated motives, specific and substantial evidence of pretext is required to survive summary

7   judgment.") (citing *Stegall,* 350 F.3d at 1066 and *Godwin,* 150 F.3d at 1221). But at summary

8   judgment, a "disparate treatment plaintiff relying on circumstantial evidence [is not required to]

9   produce more, or better, evidence than a plaintiff who relies on direct evidence." *Cornwell v.*

10  *Electra Central Credit Union*, 439 F.3d 1018, 1030 (9th Cir. 2006). That being said, "[a] 'plaintiff

11  cannot create a genuine issue of pretext to survive a motion for summary judgment by relying

12  solely on unsupported speculations and allegations of discriminatory intent.'" *Jackson v. Geithner*,

13  No. CV F 11-0055 LJO SKO, 2011 U.S. Dist. LEXIS 59483, at *34 (E.D. Cal. Jun. 3, 2011)

14  (quoting *Crawford v. MCI Worldcom Communications, Inc.*, 167 F. Supp. 2d 1128, 115 (S.D. Cal.

15  2001)).

16      Specific positive assessment of a plaintiff's performance by his or her co-workers or other

17  managers may be "specific and substantial" circumstantial evidence that the employer's negative

18  assessment was pretextual." *EEOC v. Boeing Co.*, 577 F.3d 1044, 1051 (9th Cir. 2009). Pretext

19  also can be established through comparator evidence, which here would be that "white employees

20  involved in acts against [the employer] of comparable seriousness . . . were nevertheless retained. .

21  . ." *McDonnell Douglas*, 411 U.S. at 804. For example, if an employer claims that it fired plaintiff

22  for violating workplace rules, a plaintiff may prove pretext by submitting evidence that either (1)

23  he did not violated the rule or (2) if he did, other employees who engaged in similar acts were not

24  similarly treated.  *See Vasquez* 349 F.3d at 641 ("A showing that the County treated similarly

25  situated employees outside Vasquez's protected class more favorably would be probative of

26  pretext.")

27      The question on summary judgment is whether the evidence taken as a whole (1) creates a fact

28  issue as to whether the employer's stated reasons actually motivated the employer and (2) creates

a reasonable inference of discrimination. *See Pratt v. City of Houston*, 247 F.3d 601, 606-07 (5th Cir. 2001).

Preliminarily, Mr. Larkin's initial characterization of some evidence does not hold up under closer examination. He points to Cozy's instructing Singh to hold markdowns, but that was a misreading of the record. (*See* Statement, IV.C.) Singh says that Cozy never said that. He asserts that Cozy forced out four of the five African-American managers (leaving presumably only Lionel Stevens). One of the four presumably is Mr. Larkin, and two of the other three dispute being mistreated, and the record is silent about who the third person is. (*See* Statement, VI.) He points to statements that Cozy made in Lionel Stevens's review, but the review is a great review that points out some areas for improvement. (*See id.*) Cozy says that Stevens was his best manager, and the performance review and his sending Stevens to leadership training corroborate Cozy's account. *See, e.g., Volterra Semiconductor*, 796 F. Supp. 2d at 1037 (court draws "reasonable inferences" for summary-judgment non-movant). Under proper circumstances, evidence of discriminatory treatment of other employees who are members of the protected class may create an inference of discrimination toward the plaintiff as a member of that class. *See Obrey v. Johnson*, 400 F.3d 691, 697 (9th Cir. 2005). But the record does not establish that Cozy acted with racial animus to Stevens or the other African-American store managers.

Then there is Mr. Larkin's citation to evidence that really does not contribute to an argument about pretext. The court puts the loss-prevention associate in this category. This was not Cozy's decision, and the evidence is undisputed that loss-prevention associates were rare, only 11 of 118 stores in the region have them, and Pleasanton did not qualify because it was not a high-crime store. There is also Mr. Larkin's assertion that Matos reveals her bias and animus by writing him up for firing an employee she told him to fire and then lying about it. The court is not convinced that the record supports a conclusion that she lied. Her email shows that she reminded managers to either remove employees on probation who satisfied their performance-improvement plan or terminate them if they had not. (*See* Statement, IV.A.) She did not direct them to fire, only follow this policy. The discipline notice reflects that a failure to follow Home Depot's performance-improvement process and interactive process. It's hard to see the lie: the question Matos answered

1   was whether she talked with anyone (including Mr. Larkin) about the employee's performance,

2   health (presumably relevant to the ADA issue referenced in the notice), or improvement plan, and

3   the answer was no. The record does not establish a lie, evasiveness, or testimony inconsistent with

4   the email.

5       It would be a better case for Plaintiff if he were right about inconsistent policies, manifest

6   discrimination against other African-American managers, or lies. That is the sort of evidence that

7   might suggest other lies. The question is whether the rest of Mr. Larkin's proffered evidence

8   allows his case to survive summary judgment.

9       What is left is the following narrative. Mr. Larkin contends that he was successful in doing

10  what he was sent to Pleasanton to do: turn the store around. That is supported by his favorable

11  February 2011 review by Vera, the supervisor who sent him to Pleasanton in April 2010, and he

12  points to his raising his store's sales by $1.7 million and its operational profits by $700,000 for

13  2011, and he continued that trajectory in early 2012 by increasing net sales by more than $420,000

14  from the previous year. He observes that he never had any disciplinary write-ups with Vera (or

15  any bad reviews before Cozy), and he shows the immediate escalation of disciplinary notices

16  under Cozy (and Matos too). He contrasts Cozy's treatment of other similarly situated supervisors

17  who are not African-American. He cites testimony from other managers (Carter, Shaffer, and

18  Nunez), and they support the conclusion that Mr. Larkin had a good store and Cozy was hard on

19  him. They also did not get written up for similar infractions.

20      To counter this, Home Depot says that Mr. Larkin was disciplined more than all other store

21  manager in the district and that the person after him that had the most disciplinary notices was a

22  J.B., who is not African-American and who was fired two months after Mr. Larkin. (ECF No. 56-

23  2 at 4, ¶¶15-16 & Ex. 20). Home Depot also discounts Plaintiff's comparator evidence based on

24  Cozy's asserted policies of not disciplining newer managers and saying that this is "nothing more

25  than a challenge to Home Depot's business judgment." (ECF No. 56 at 10-12.) It also discounts

26  Mr. Larkin's reliance on his sales and profits because other metrics (such as shrink and

27  markdowns) matter too and suggests that the rising economy (not Mr. Larkin) is responsible for

28  the profits. And its strongest argument is that the record conclusively reveals non-discriminatory

reasons for its decision.  It points out that all employees were disciplined.

In the end, it may be that Plaintiff's comparator evidence is weak.  But after many hours sifting through the parties' submitted records regarding the disciplinary actions for other store managers, the court is not prepared to discount the evidence at summary judgment without a more robust understanding of the context of the personnel decisions (or lack of them) for managers that Cozy did and did not discipline. Also, there is the other evidence that the court recounts in this section that supports Mr. Larkin's claim of pretext. The record does seem to support the conclusion that Cozy was hard generally on metrics such as shrink and markdowns. But there is enough that the weighing of the facts and inferences is for the jury.

### B.  Failure to Promote

Another issue is whether the outcome is different for Mr. Larkin's claim based on the failure to promote him.  In a failure-to-promote case, the plaintiff must prove that he was in a protected group, was qualified for the promotion, and had a reasonable expectation of being promoted. Usually that means actually applying for the promotion. But a plaintiff need not prove that he applied for a position where no competitive application process existed.  *Lyons v. England*, 307 F.3d 1082, 1114 (9th Cir. 2002).  Home Depot argues that he was not promotable, but the court cannot conclude that as a matter of law on this record.

## III.  RETALIATION CLAIM

To state a *prima facie* claim for retaliation, Mr. Larkin must show that: 1) he engaged in a "protected activity"; 2) his employer took an adverse employment action against him; and 3) there was a causal connection between the protected activity and the employer's act.  *See e.g., Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 506 (9th Cir. 2000); *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal.4th 1028, 1042 (2005).

The timeline is that Mr. Larkin complained of discrimination to Matos and Cozy in September 2011, after what he thought was an unfair mid-term review.  Later that month, he was disciplined. And then Cozy and Matos were responsible for firing him.  Home Depot says that, under the controlling law, the court should not infer that Larkin was fired in retaliation for having complained of unlawful discrimination because the two events (complaint and termination) are too

United States District Court
Northern District of California

United States District Court
Northern District of California

1   separate in time. (ECF No. 45-1 at 27-28.) Larkin responds that retaliation did not lie in the firing

2   alone; rather, after his complaint, Cozy and Matos undertook a yearlong pattern of retaliation

3   consisting of excessive oversight, a string of disciplinary notices, and finally Larkin's being fired.

4   (ECF No. 54 at 26.)

5        The court finds the timing issue inconclusive. A three-month gap can be enough to preclude a

6   finding of retaliation — at least, where retaliation was inferred specifically from the timing of the

7   events. *See Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001) (per curiam) (citing

8   cases for the proposition that a three-month and four-month time lapse is insufficient to infer

9   causation); *see also Manatt v. Bk. of Am.*, 339 F.3d 792, 802 (9th Cir. 2009) (retaliation could not

10  be inferred from nine-month gap). Positive events occurring in the interim, moreover — such as

11  the pay raise that Cozy gave Mr. Larkin (ECF No. 45-9 at 37-38) — can further bar a finding of

12  retaliation. *See Manatt*, 339 F.3d at 802 (no inference of retaliation where complaining employee

13  received pay raise and "prestigious" promotion). On the other hand, as Mr. Larkin argues, an

14  employee's grievance "may" be found to have caused retaliation, even where the events are

15  separated by a year or more if, in the intervening period, "the employer engages in a pattern of

16  conduct consistent with a retaliatory intent." *See Wysinger v. Auto. Club of S. California*, 157 Cal.

17  App. 4th 413, 421 (2007) (citing *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1010 (7th Cir.

18  2000)).

19       Here, Larkin alleges a pattern of discrimination between the time he complained and the time

20  he was fired. Thus, for the reasons stated in the previous section, the court cannot conclude as a

21  matter of law that the claim fails at summary judgment.

**CONCLUSION**

23       The court denies Home Depot's motion for summary judgment.  This disposes of ECF No. 45.

24  **IT IS SO ORDERED.**

25       Dated: December 18, 2014

26                                                            _____

27                                                            LAUREL BEELER
                                                             United States Magistrate Judge
28